**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CENTER FOR RURAL AFFAIRS,<br>*Plaintiff*,<br>v.<br>UNITED STATES OF AMERICA,<br>*Defendant*. | Case No. 26-894C<br>Judge Carolyn N. Lerner |

**FIRST AMENDED COMPLAINT**

Plaintiff, the Center for Rural Affairs (the "Center"), by and through undersigned counsel, hereby files this First Amended Complaint against Defendant, the United States of America ("United States"), acting through the Environmental Protection Agency ("Agency" or "EPA"), stating the following in support thereof:

## I. NATURE OF THE CASE

1. This is a breach of contract action arising from the EPA's decision to unilaterally terminate a competitive grant awarded to the Center under the Solar for All program in violation of the express terms of the grant agreement.

2. That grant agreement gave rise to binding contractual obligations between the EPA and the Center. The Center brings this action seeking monetary damages resulting from the EPA's breach.

3. Congress established the grant program, known as "Solar for All," as part of the Inflation Reduction Act of 2022 ("IRA"). The IRA added Section 134 to the Clean Air Act, directing the EPA to make competitive grant awards to States, municipalities, Tribes, and eligible nonprofits "to enable low-income and disadvantaged communities to deploy or benefit from zero-

emission technologies." Pub. Law 117-169, § 60103 (Aug. 16, 2022). In the same legislation, Congress appropriated $7 billion under Section 134 to fund those competitive grants. *Id.* The EPA implemented these aspects of Section 134 through the Solar for All grant program.

4. The EPA selected 60 qualified Solar for All grant recipients on a competitive basis, including the Center. The EPA then awarded the full $7 billion that Congress appropriated.

5. The EPA executed a binding grant agreement with the Center in July 2024, awarding $62,450,000 to the Center to perform Solar for All program activities in the State of Nebraska (as amended, the "Grant Agreement"). The EPA then obligated a corresponding amount of funding to the Center from the Solar for All program Congress previously appropriated. The EPA and the Center entered into an amended binding grant agreement in January 2025 for the same award amount, which included updated terms and conditions.

6. The Grant Agreement permitted the EPA to unilaterally terminate the agreement only in the narrowest of circumstances—namely, upon a substantial noncompliance that materially impairs performance, adequate evidence of waste, fraud, or abuse, or material misrepresentation of eligibility status.

7. In August 2025, the EPA announced the cancellation of the Solar for All program, unilaterally terminated the Grant Agreement citing the passage of recent legislation, and suspended or restricted the Center's ability to draw down obligated grant funds through the federal government's Automated Standard Application for Payments ("ASAP") portal. This unilateral termination by the EPA materially breached the Grant Agreement.

8. Taking matters further, the EPA unlawfully interfered with the Center's performance of the Grant Agreement both before and after the termination. Without notice or explanation, the EPA intermittently froze the Center's access to obligated funds in ASAP over the

course of approximately four weeks in early 2025. Then, in connection with the termination, the EPA assured the Center that it could continue to draw funds for allowable costs incurred before termination. But the EPA again suspended the Center's ASAP account. Within days, the EPA cut the authorized funding to less than 8% of the obligated amount, shortened the period of performance, and marked the account "Liquidated"—all before any closeout reports were due and before the Center's time to dispute the termination expired. These actions, which the termination did not require, deprived the Center of more than 92% of its obligated funds and prevented it from satisfying commitments it properly incurred in performing the approved workplan.

9. The Center brings this action against the United States, acting by and through the EPA, seeking monetary damages suffered resulting from the EPA's breach of the Grant Agreement. The Center's damages include the full value of the award under the Grant Agreement, together with direct, expectation, and consequential damages, pre- and post-judgment interest, attorney fees, and such other relief as the Court may deem proper.

## II. <u>PARTIES</u>

10. Plaintiff is the Center for Rural Affairs, a Nebraska nonprofit corporation headquartered in Lyons, Nebraska. The Center's mission is to establish strong rural communities, social and economic justice, environmental stewardship, and genuine opportunity for all. The Center is the recipient of Grant Agreement No. (FAIN) 84092101 awarded by the EPA under the Solar for All program.

11. Defendant is the United States of America, acting through the Environmental Protection Agency, an independent agency under the authority of Article II of the United States Constitution.

## III. JURISDICTION AND VENUE

12. The United States Court of Federal Claims has jurisdiction over the claims set forth in this Complaint pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1). Specifically, this Court has "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." *Id.*[1]

13. Venue for this breach of contract dispute is proper before the United States Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1).

14. The claims set forth in this Complaint are timely under 28 U.S.C. § 2501, which requires that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." *Id.* The Center's claims set forth in this Complaint accrued when the EPA terminated the Grant Agreement on or about August 7, 2025.

## IV. FACTUAL ALLEGATIONS

### A. The Greenhouse Gas Reduction Fund.

15. On August 16, 2022, the IRA was signed into law. Section 60103 of the IRA created a $27 billion "Greenhouse Gas Reduction Fund" by adding a new Section 134 to the Clean Air Act. *See* Pub. Law 117-169, § 60103 (Aug. 16, 2022), *repealed by* Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (July 4, 2025) (rescinding only "the *unobligated* balances of amounts made available to carry out that section (as in effect on the day before the enactment of this Act)" (emphasis added)).

[1] The Center files this action to solely seek monetary damages for the EPA's breach of the Grant Agreement, and does not waive any rights to challenge any Agency action relating to the Solar for All program in any other forum.

16. As part of the Greenhouse Gas Reduction Fund, Congress specifically appropriated $7 billion to the EPA to support zero-emission technologies and directed the EPA Administrator "to make grants, on a competitive basis . . . to States" and other "eligible recipients" for the purpose of "providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities." *Id.* "Eligible recipients" included nonprofit organizations like the Center. *Id.*

17. Section 60103 statutorily authorized the EPA to execute contractual agreements on behalf of the United States. In the portion of Section 60103 addressing the competitive grant program, Congress directed that the appropriated program funds had to be used for a specific purpose: to deploy or provide benefits from zero-emission technologies to low-income and disadvantaged communities.

18. Although the statute authorized the EPA Administrator to determine what supported activities were "appropriate . . . in accordance with this section," it did not give the EPA Administrator discretion to refuse to use any part of the $7 billion to award competitive grants to eligible recipients. *Id.* Rather, Congress directed the EPA to begin awarding grants "not later than 180 calendar days" after August 16, 2022 and provided that the appropriated funds would "remain available until September 30, 2024." *Id.*

**B. <u>The Solar For All Grant Program</u>.**

19. On June 28, 2023, the EPA published a Notice of Funding Opportunity ("NOFO") for the zero-emission technology competitive grant program, which the Agency referred to as the "Solar for All" program. *See* Funding Opportunity No. EPA-R-HQ-SFA-23-01, available online

at https://www.grants.gov/search-results-detail/348957 (last accessed on October 29, 2026). The NOFO invited eligible participants to apply for one of the 60 anticipated Solar for All grant awards.

20. The NOFO emphasized that the competitive Solar for All grant awards were "designed to spur the deployment of residential distributed solar energy to lower energy bills for millions of Americans and catalyze transformation in markets serving low-income and disadvantaged communities." NOFO at 5.

21. According to the NOFO's Funding Opportunity Description: "Per Section 134(a)(1) of the Clean Air Act, 100% of all Solar for All funds must be deployed 'to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.'" *Id.*

22. To establish eligibility, the NOFO required applicants to submit to EPA a Notice of Intent describing, in relevant part, the applicant's name, the number and type of applications, program location, and an estimate of EPA funding that may be requested. *See id.* at 18–20.

23. On August 11, 2023, the Center timely submitted a Notice of Intent (dated August 10, 2023) to the EPA under the NOFO.

24. On October 11, 2023, the Center timely submitted an application to the EPA seeking the award of a Solar for All grant to support the Nebraska Solar for All program, in accordance with and subject to the terms of the NOFO. A day later, on October 12, 2023, the EPA administratively closed the NOFO.

25. The Center's grant application submitted to the EPA to administer the Solar for All program included 27 letters of support from stakeholders across the State of Nebraska, including public utilities, housing organizations, tribes, municipalities, and the state's investment finance authority.

**C. <u>The EPA Awards a Solar For All Grant to the Center</u>.**

26. On July 12, 2024, the EPA issued a Grant Agreement and Notice of Award to the Center for Nebraska Solar for All, identified as Grant Agreement No. (FAIN) 84092101 (the "Initial Grant Agreement"). The Initial Grant Agreement stated that the EPA "hereby awards $62,450,000.00," and identified a "Total EPA Amount Awarded This Action" of $62,450,000. The Initial Grant Agreement further identified an "Obligation" of $62,050,000 (the total EPA amount awarded net of a $400,000 "EPA In-Kind Amount").

27. Associate Award Official Barbara Proctor digitally signed the Initial Grant Agreement on behalf of the EPA on July 12, 2024. The Associate Award Official had authority to execute the Initial Grant Agreement, creating a binding contractual instrument on behalf of the United States.

28. The Initial Grant Agreement specifically provided that "[t]he recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date." The Initial Grant Agreement lists a mailing date of July 17, 2024.

29. The Center did not file a notice of disagreement with any of the Initial Grant Agreement's terms and conditions within 21 days after the July 17, 2024 mailing date. The Grant Agreement thus became a binding contractual instrument between the Center and the EPA in accordance with its terms and conditions.

30. The Grant Agreement included a specific term and condition that required the Center to submit revised versions of the documents included in its prior application to the EPA, including the grant budget. The Grant Agreement also provided that the EPA and the Center would

work together to refine the grant budget, and limited the funding available to the Center under the Grant Agreement pending the EPA's approval of the revised budget. The Grant Agreement provided for removal of the funding availability limitation following the EPA's approval of the revised budget.

31. The Grant Agreement also included a specific term and condition that set forth a planning period during which the Center would work with the EPA to refine the grant workplan, timeline, and budget before beginning full implementation. The Grant Agreement similarly limited grant funding available to the Center during this planning period. The Grant Agreement required the EPA's approval by email confirming completion of the planning period. The EPA notified the Center that it satisfactorily completed the planning period by email in January 2025.

32. The Center worked with the EPA to refine and finalize its Nebraska Solar for All workplan, timeline, and budget and obtain the necessary EPA approvals.

33. The EPA issued an Assistance Amendment to the Center, dated January 8, 2025 (the "Amended Grant Agreement"). The Amended Grant Agreement removed the specific term and condition that limited grant funding available to the Center.

34. Associate Award Official Keva R. Lloyd digitally signed the Amended Grant Agreement on behalf of the EPA. The Associate Award Official had authority to execute the Amended Grant Agreement, thus creating a binding contractual instrument on behalf of the United States.

35. Among other changes, the Amended Grant Agreement incorporated updated termination provisions and removed the grant funding availability restriction.

36. Like the Initial Grant Agreement, the Amended Grant Agreement stated that "[t]he recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds

within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date."

37. The Center did not file a notice of disagreement with any of the Amended Grant Agreement's terms and conditions within 21 days after the January 8, 2025 mailing date. The Center also drew down funds within 21 days after the mailing date of the Amended Grant Agreement. The Grant Agreement thus remained a binding contractual instrument between the Center and the EPA in accordance with its terms.

**D. The Center's Grant Terms Establish a Binding Contractual Relationship.**

38. As the Department of Justice ("DOJ") conceded in related litigation regarding the Solar for All program, grant agreements like the one at issue here are contracts that set forth the terms of funding and memorialize commitments from the recipient. *See State of Ariz. v. U.S. Env't Prot. Agency*, No. 2:25-cv-02015, Dkt. No. 102 (W.D. Wash. Dec. 5, 2025), *dismissed without prejudice* 2026 WL 1533001, at *9 (W.D. Wash. June 1, 2026) (the "Arizona Lawsuit"). For example, in the Arizona Lawsuit, DOJ conceded that claims alleging the EPA improperly terminated grant agreements are properly before the United States Court of Federal Claims ("COFC") pursuant to the Tucker Act, because the Tucker Act vests COFC with jurisdiction over suits based on "'any express or implied contract with the United States.'" *Id.* at 11–17.

39. DOJ specifically argued that "claims founded on grants," like the Solar for All grant, "are implemented through 'contracts to set the terms of and receive commitments from recipients.'" *Id.* at 12. DOJ further argued that the government's obligation to the plaintiffs under their grant agreements was, "in the first instance dependent on the contract," and that the grant agreements are themselves the grantees' "source of rights." *Id.* at 12, 16.

40. Under the doctrine of judicial estoppel, these admissions by the United States preclude it from now taking the inconsistent legal position that the Solar for All grants are not enforceable contracts executed by the EPA with requisite authority.

**E. <u>The Grant Agreement and the Center's Workplan Contemplated the Center's Use of Revolving Funds Beyond the Period of Performance</u>.**

41. The Solar for All grant program permitted recipients to use grant funds in ways that generate revenue and to use that revenue for purposes consistent with the terms of the grant program. Section III.E of the Grant Agreement, titled "Revolving Loan Fund Characterization," states: "EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d)."

42. In turn, 2 C.F.R. § 1500.8(d) states:

> Recipients of EPA funding for other revolving loan fund programs may use EPA grant funding prior to using program income funds generated by the revolving loan fund. Recipients may also keep program income at the end of the assistance agreement as long as they use these funds to continue to operate the revolving loan fund or some other authorized purpose as outlined in their closeout agreement.

43. The Grant Agreement also includes at Section III.S. a self-executing Closeout Agreement under which, "after the end of the Period of Performance" of the Grant Agreement, "the Recipient may keep and use Program Income remaining . . . and use Post-Closeout Program Income in accordance with this term and condition."

44. In addition, the EPA's obligation to monitor the use of Program Income following completion of the period of performance was explicitly contemplated "in accordance with the terms of this Closeout Agreement."

45. This is consistent with the enabling statute for the Solar for All program. IRA Section 60103(b)(1)(C) specifically provides:

> (b) USE OF FUNDS.— An eligible recipient that receives a grant pursuant to subsection (a) shall use the grant in accordance with the following:
>
> (1) DIRECT INVESTMENT.— The eligible recipient shall—
>
> . . . .
>
> (C) retain, manage, recycle, and monetize all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability.

46. These provisions demonstrate that Congress designed the Solar for All program to generate long-term, self-sustaining financial benefits to recipients and eligible beneficiaries that would continue well after the grant's period of performance.

47. Consistent with the terms of the Grant Agreement, the Center's implementation plan included use of Solar for All funds to create a revolving loan fund. The Center described these plans in a finalized Revised Workplan that it submitted to the EPA on January 16, 2025. The Revised Workplan described the Center's proposed grant objectives, desired outcomes, and projected goals in performing the Solar for All grant, referred to as "Nebraska Solar for All" or "NSFA."

48. Under Program Objective 3 of the Revised Workplan, the Center stated it would "use $46.8 million (75%) of the $62.4 million NSFA grant award for financial products in the form of the NSFA Revolving Loan and Grant Fund."

49. The Revised Workplan further explained: "The revolving loan portion will continue to fund additional solar projects and to benefit eligible participants beyond the five-year NSFA grant period. The NSFA award will provide the initial funding for this fund. Repayment of loans would partially replenish the fund over time."

50. On January 17, 2025, the EPA confirmed by email that "[t]he Center for Rural Affairs has met the Planning Period Term and Condition, with the specific condition III.A.2 removed without further action from the Recipient required upon receipt of this email in accordance with 2 CFR 200.208(e). The updated workplan is in effect."

51. The Revised Workplan submitted by the Center expressed its intent to use a major portion of the Center's grant funds to create a revolving fund, and the EPA expressly approved the Revised Workplan. Based on the EPA's approval, the Center reasonably expected that the Solar for All grant funds would be deployed as planned and would continue to generate benefits beyond the Grant Agreement's period of performance.

### F. The Grant Agreement's Termination Provisions.

52. The Grant Agreement contained a termination provision defining the EPA's right to terminate the agreement. Specifically, Section III.Q.5, titled "Termination," states:

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination.

53. Accordingly, the Grant Agreement clearly and unambiguously specified only three bases permitting unilateral termination by the EPA: (1) substantial noncompliance that materially impairs effective performance; (2) adequate evidence of waste, fraud, or abuse; or (3) material misrepresentation of eligibility status.

54. The termination provision of the Grant Agreement further provides: "If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to

effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation."

55. Through this provision, the EPA and the Center agreed that funds obligated under the Grant Agreement would remain dedicated to the Solar for All program and its statutory objectives even in the event of a permissible termination.

**G. <u>The Center's Performance Under the Grant Agreement</u>.**

56. The Center proposed NSFA to support residential-serving community solar and both single-family and multifamily residential rooftop solar to benefit low-income households.

57. Based on internal modeling, the Center designed NSFA to reach approximately 3,000 low-income households, deploy 24 megawatts of solar, and deliver an estimated 107,000-ton reduction in CO2 emissions during the Grant Agreement's period of performance.

58. The Center designated approximately 25% of the NSFA award for technical assistance to support solar projects, including general program outreach, planning, program design, and project assistance.

59. The Center expected to utilize the remaining 75% of the Grant Agreement award, or approximately $46.8 million, for ongoing financial assistance. This included offering financial products in the form of low-interest loans, no-interest loans, leases, power purchase agreements, and grants to support solar deployment strategies. The Center planned to accomplish this by using grant funding to capitalize a revolving loan fund, consistent with the Grant Agreement. The Center intended for repayments of loans and other arrangements financed through grant funding to be returned to the revolving loan fund. The Center intended to use that revolving loan fund to finance additional solar projects after expiration of the period of performance.

60. In the first year of the NSFA program, the Center developed detailed program plans and financial modeling to support those plans, conducted extensive stakeholder outreach, conducted competitive procurement processes, signed term sheets for program loans, and signed a letter of intent to proceed with the first community solar projects under the program.

61. Beginning in May 2024, the Center began hiring staff to perform the Grant Agreement. By August 2025, the Center dedicated 5 full-time equivalent employees to the NSFA program, 4 of whom would not have been hired but for the EPA's award.

62. The Center's team for the NSFA program conducted substantial work to collect information from potential project partners and suppliers, and spent extensive time and effort developing specific requirements and evaluation criteria to support procurement efforts.

63. Through August 7, 2025, the Center requested draw-downs of $696,879 in allowable costs incurred under the Grant Agreement through the ASAP portal. The Center applied these funds to staff program planning, compliance, stakeholder outreach, and project development, creating the infrastructure necessary to quickly achieve the goals of the NSFA program.

64. At no point during the Center's performance did the EPA raise concerns regarding the Center's performance, its eligibility, or its compliance with terms of the Grant Agreement.

### H. The OBBBA Repeals Section 134 of the Clean Air Act and Rescinds Only Unobligated Funds.

65. On July 3, 2025, Congress passed a budget reconciliation bill, H.R. 1, popularly referred to as the "One Big Beautiful Bill Act" or "OBBBA." *See* Pub. Law 119-21, 139 Stat. 72 (July 4, 2025).

66. Section 60002 of the OBBBA provides that "Section 134 of the Clean Air Act (42 U.S.C. § 7434) is repealed and the unobligated balances of amounts made available to carry

out that section (as in effect on the day before the date of enactment of this Act) are rescinded." 139 Stat. at 154.

67. By its explicit terms, the OBBBA rescinded only "the *unobligated* balances of amounts made available to carry out" Section 134 of the Clean Air Act. *Id*. (emphasis added).

68. Upon issuing the Initial Grant Agreement, the EPA obligated all funds necessary to perform the agreement before the OBBBA's passage. As a consequence, those obligated funds were not subject to the repeal set forth in Section 60002 of the OBBBA.

69. Relevant legislative history emphasizes that Congress did not intend the OBBBA to rescind funds previously obligated by the EPA under the Solar for All program. Representative Morgan Griffith (R-Va.), then-Chair of the House Energy and Commerce Committee's Subcommittee on the Environment, stated: "[T]hese provisions that we are talking about only apply as far, as this bill is concerned, to the unobligated balances. So if a grant was already given, as far as this bill is concerned, then that would still be going forward. . . . [W]e can't rescind expenditures that have already been obligated." 171 Cong. Rec. S4282–83 (July 9, 2025).

70. Representative Brett Guthrie (R-Ky.), Chair of the House Energy and Commerce Committee, likewise explained that the OBBBA "does not close the grants on any obligated funds." 171 Cong. Rec. S4283 (July 9, 2025).

71. The Congressional Budget Office estimated that repealing and rescinding unobligated funds from all three of the Greenhouse Reduction Fund grant programs, including the Solar for All program, would net only $19 million in savings, approximately the remaining balance of the EPA's administrative cost appropriation under 42 U.S.C. § 7434(a)(4)—not the $7 billion already awarded and obligated by the EPA under the Solar for All program. *See* CBO, *Estimated Budgetary Effects of Public Law 119-21, to Provide for Reconciliation Pursuant to Title II of H.*

*Con. Res. 14, Relative to CBO's January 2025 Baseline*, tab Title VI, rows 19–21 (July 21, 2025), https://www.cbo.gov/publication/61570 (last accessed on October 29, 2026).

72. Indeed, multiple courts have recently confirmed this reading of the OBBBA in litigation brought by other Solar for All grant recipients. On September 18, 2026, the United States District Court for the District of Rhode Island reached a consistent conclusion in a challenge brought by downstream beneficiaries of the Solar for All program. *See R.I. AFL-CIO v. U.S. Env't Prot. Agency*, No. 1:25-cv-00510, Dkt. No. 48 (D.R.I. Sept. 18, 2026) ("*R.I. AFL-CIO*"). The Court observed, "[a]s made clear through Section 60002 and as supported by its accompanying legislative history, existing grants were not to be rescinded," and that "[t]he more obvious reading of Congress's intent is that, while grant funding from the Greenhouse Gas Reduction Fund was to no longer be available following the OBBBA, already *existing grant awards were to remain in place*, subject to the residual statutory authority under which they were originally obligated." *Id.* at 11 (emphasis added).

73. Rejecting the EPA's contention that the OBBBA converted the obligated Solar for All funds into lump-sum amounts subject to the agency's discretion, the Court held:

> *Congress's clear intent was that EPA continue to administer the already obligated SFA grants*. Defendants acted contrary to this intent, and with no other statutory authority, when they terminated the SFA program. The Termination Decision was therefore contrary to law and in excess of its statutory authority, in violation of the APA.

*Id.* at 18 (emphasis added).

74. Similarly, on September 22, 2026, the United States District Court for the District of Columbia confirmed this interpretation of the OBBBA. *See Harris Cnty., Tex. v. U.S. Env't Prot. Agency*, No. 1:25-cv-03646 (TSC), Dkt. No. 58, at 12–15 (D.D.C. Sept. 22, 2026) ("*Harris County*"). Construing the plain text of Section 60002, the Court held:

> By its plain language, § 60002 had two operative effects: it (1) 'repealed' the government's authority under CAA § 134 to make GGRF grants, and (2) 'rescinded' certain funding to 'carry out' the GGRF. This is a far cry from authorizing—much less requiring—the government to claw back funds that had already been obligated."

*Id.* at 13. As the Court explained, "by rescinding only 'unobligated balances' available to carry out § 134, Congress impliedly declined to rescind obligated ones, meaning the provision left funds already obligated to grant recipients undisturbed," and that "[w]hatever the practical consequences of Congress's rescission of unobligated administrative funds, they do not change the fact that Congress expressly chose to leave obligated grant funds undisturbed." *Id.* at 14, 15.

75. The Court reasoned that, "[b]ecause EPA's termination of the SFA program rested on a contrary reading—that § 60002 reached obligated funds as well—the Elimination Decision both exceeded the agency's statutory authority and was arbitrary and capricious," and it vacated the EPA's "policy-level determination that OBBBA rendered continued operation of SFA legally impermissible." *Id.* at 15, 17.

76. Likewise here, the EPA's reliance on Section 60002 as the sole basis for terminating the Grant Agreement is erroneous and contrary to law.

## I. <u>The EPA Unlawfully Interfered with and Deprived the Center's Access to Funds Awarded under the Grant Agreement</u>.

77. The Grant Agreement designated ASAP as the payment method for the award. Under the EPA's General Terms and Conditions incorporated into the Grant Agreement, "the recipient initiates an electronic payment request online via ASAP, which is approved or rejected based on the amount of available funds authorized by EPA in the recipient's ASAP account." As a result, the Center's ability to access its obligated grant funds depended entirely on the amount the EPA authorized, and the Center's ASAP account status maintained by the EPA.

78. On July 17, 2024, the EPA obligated $62,050,000, the full amount of the Grant Agreement, to the Center's ASAP account. Thereafter, the Center requested and received draw-downs of allowable costs through ASAP on or about September 18, 2024, October 22, 2024, and January 16, 2025.

79. In January 2025, within days of the change in Presidential administration, the EPA improperly froze the Solar for All awards, including the Center's. On January 30, 2025, the Center emailed its EPA Project Officer regarding its lack of access to its Solar for All grant funds in ASAP. The Center's ability to access its Solar for All grant funds through ASAP was suspended and reinstated at least twice more in February 2025. The EPA did not provide the Center advance notice of its decision to administratively freeze the ASAP account or explain when or why its access to obligated funds had been cut off. This lack of notice, explanation, or certainty in the availability of grant funds caused the Center to pause hiring and the issuance of new RFPs, delaying the Center's implementation of its Workplan.

80. On February 21, 2025, approximately *four weeks* after the intermittent freezes began, the EPA notified Solar for All awardees by email that they may resume drawing down from ASAP. The Center thereafter continued to request and receive draw-downs of allowable costs through ASAP, including on March 6, April 15, July 2, July 11, August 6, and August 7, 2025.

81. On August 7, 2025, the same day that the EPA transmitted a memorandum to the Center terminating the Grant Agreement (the "Termination Memorandum"), an unlawful action discussed in more detail below, an ASAP Account Profile Inquiry obtained by the Center at 7:02 PM showed that the Account Status Indicator changed to "Suspended," although the Available Balance of $61,353,119.36 remained in the ASAP account consistent with the Grant Agreement.

82. Days later, on August 11, 2025, the EPA reduced the Center's ASAP authorization by $57,134,012.21, with an effective date of August 8, 2025. That reduction left a cumulative authorized amount of only $4,915,987.79, less than 8% of the $62,050,000 obligated under the Grant Agreement. The Center confirmed EPA's reduction in obligated funds on August 12, 2025 through an ASAP Account Profile Inquiry, which showed that the account remained in "Suspended" status.

83. By August 18, 2025, the EPA had changed the Center's Account Status Indicator to "Liquidated," changed the Performance Period End Date from April 30, 2029 to August 15, 2025, and changed the account End Date from August 30, 2029 to December 8, 2025.

84. The EPA made each of these changes to the Center's ASAP account without notice to the Center and without explanation. The EPA did so before any closeout reports had been submitted or were due, and before expiration of the 30-day period to file an administrative dispute referenced in the Termination Memorandum.

85. The Center objected to these ASAP changes in its August 27, 2025 administrative dispute, enclosing the ASAP Account Profile Inquiries and inviting discussion of possible solutions with its EPA Project Officer copied. In its November 20, 2025 petition for reconsideration, the Center again advised the EPA that the reduction of its available funding in ASAP had prevented it from drawing the grant funds required to meet its pre-termination commitments and other allowable costs.

86. Because the funds remaining available in ASAP were a fraction of what the Center needed to address its pre-termination commitments, and in view of its pending dispute, the Center refrained from drawing down the reduced balance except for two limited draws: $14,866.85 received on November 21, 2025 for payroll and related expenses incurred between August 1, 2025

and the close of business on August 7, 2025, and $15,588.15 received on December 4, 2025 for costs of preparing required reporting.

87. Through these actions, the EPA repeatedly suspended, restored, reduced, and re-characterized the Center's access to obligated grant funds in ASAP without notice, justification, or explanation, both before and after the termination. These actions were separate from, and not required by, the EPA's termination of the Grant Agreement, and they deprived the Center of access to more than 92% of the funds the EPA had obligated to it.

### J. The EPA Delayed the Approvals and Guidance on Which the Center's Deployment of Grant Funds Depended.

88. In addition to restricting the Center's access to obligated funds in ASAP, beginning in the spring of 2025 the EPA unreasonably delayed the approvals and guidance on which the Center's deployment of grant funds depended.

89. Section II.H of the Grant Agreement required the Center to obtain EPA approval of a Quality Management Plan ("QMP") and a Quality Assurance Project Plan ("QAPP") "[p]rior to beginning Environmental Information operations specified in the Performance Reporting Programmatic Term and Condition." The QMP and QAPP relate to environmental information generated in grant implementation, such as geospatial data, solar array project attributes, and emissions reductions. The EPA required Solar for All recipients, including the Center, to obtain EPA approval of a QMP and, following that approval, to submit a QAPP before deploying grant funding, which in the Center's case was to be deployed through the NSFA Revolving Loan and Grant Fund.

90. The Center submitted its QMP to the EPA on March 3, 2025. The EPA did not provide feedback until approximately three months later, on or about June 3, 2025. The Center

promptly returned a revised QMP on June 17, 2025. The EPA did not approve the QMP until more than one month later, on July 21, 2025.

91. The Center worked to develop its QAPP in parallel with the EPA's review of the QMP. However, the EPA did not permit grant recipients to submit QAPPs until after a QMP had been approved. The EPA also required QAPPs to include a methodology for determining household savings arising from projects executed with Solar for All funding, consistent with EPA technical guidance. The EPA repeatedly delayed issuance of that technical guidance, publishing a finalized version of its household savings guidance in July 2025, just weeks before the termination. In a May 20, 2025 update to grant recipients concerning environmental information operations and household savings, the EPA itself acknowledged "delays and disruptions in our typical communications and review processes."

92. Despite these delays, the Center worked diligently to complete its QAPP, submitting it to the EPA on August 7, 2025, in the hours before the EPA notified the Center of the termination.

93. Upon information and belief, these delays did not reflect the ordinary course of business in the administration of a federal grant. Following the change in Presidential administration, internal EPA approvals of guidance and grant materials became more difficult to obtain, and the EPA reduced the staffing levels to oversee the Solar for All program.

94. By requiring the Center to obtain EPA approval of its QMP and QAPP before deploying grant funds and then delaying those approvals and the issuance of the technical guidance necessary to prepare the QAPP, the EPA delayed the Center's placement of grant funding through the NSFA Revolving Loan and Grant Fund, frustrated its implementation of the approved Revised Workplan, and harmed the Center's reputation with potential project sponsors.

**K. <u>The EPA Unlawfully Terminated the Center's Grant Agreement</u>.**

95. As explained above, on August 7, 2025, the EPA transmitted the Termination Memorandum to the Center terminating the Grant Agreement.

96. The 2025 Termination Memorandum set forth the EPA's basis for terminating the Grant Agreement as follows: "Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134."

97. The Termination Memorandum further asserts that "the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All" and that "Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate."

98. The Termination Memorandum also represented to the Center that "[t]he recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan."

99. The Termination Memorandum further acknowledged that "[c]osts incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect." *Id.* (citing 2 C.F.R. § 200.343).

100. Notwithstanding these representations, on the same day the EPA transmitted the Termination Memorandum, it suspended and then sharply limited the Center's access to obligated Solar for All funds through the ASAP portal, beginning at approximately 6:00 PM Central time on August 7, 2025.

101. The EPA's restriction of ASAP access was not required by the Grant Agreement, the Termination Memorandum, or any applicable regulation. Instead, the governing regulation provides that "[t]he Federal agency or pass-through entity must not delay payments to the recipient or subrecipient for costs meeting the requirements of subpart E of this part." 2 C.F.R. § 200.344(d).

102. By restricting the Center's access to obligated funds at the same time it told the Center those funds remained available for allowable, properly incurred costs, the EPA impeded the Center's ability to liquidate obligations it had properly incurred in performing the approved workplan, including staffing, procurement, and project-development obligations.

103. Critically, the Termination Memorandum does not state that: (1) the Center was in substantial noncompliance with the terms of the Grant Agreement that materially impaired effective performance; (2) the EPA possessed adequate evidence of waste, fraud, or abuse committed by the Center during its performance of the Grant Agreement; or (3) the Center materially misrepresented its eligibility or status to obtain the grant.

104. The next day, on August 8, 2025, the EPA transmitted to the Center an Assistance Amendment under the Grant Agreement (the "Termination Amendment"). The Termination Amendment states: "The Agency is asserting its right under 2 CFR 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR 200.341."

105. 2 C.F.R. § 200.340 permits unilateral termination by the EPA in two instances: when the recipient fails to comply with the terms and conditions of the award, and when the award's terms and conditions permit unilateral termination. The Termination Memorandum does not state that the Center failed to comply with the terms and conditions of the Grant Agreement and the Grant Agreement does not otherwise permit unilateral termination in these circumstances.

106. In the Termination Amendment, the EPA further directed the Center to "immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement."

107. The Termination Amendment provides, "If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date." The Termination Amendment bore a mailing date of August 7, 2025.

108. The Center timely submitted a notice of disagreement to the EPA Award Official on August 27, 2025.

109. Although it was not required to do so to preserve its contractual rights, the Center timely submitted an administrative dispute on August 27, 2025 according to the instructions in the Termination Memorandum and EPA's dispute regulations in Title 2, Part 1500, Subpart E of the Code of Federal Regulations. By memorandum dated November 7, 2025, the EPA notified the Center that its administrative dispute was dismissed as moot, citing the OBBBA's rescission of the EPA's funding for the Solar for All program.

110. Although it was not required to do so to preserve its contractual rights, on November 20, 2025, the Center timely submitted a petition for reconsideration pursuant to 2 C.F.R.

§ 1500.17. As of this filing, the Center has not received a response from EPA to its petition for reconsideration.

**CLAIMS FOR RELIEF**

**COUNT I**
**BREACH OF GRANT AGREEMENT**

111. The Center incorporates the preceding paragraphs by reference as though fully set forth herein.

112. The Tucker Act permits the Center to bring suit in the United States Court of Federal Claims seeking "judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

113. The elements to establish a breach of contract are: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) (citations omitted).

114. The Grant Agreement is a binding contract between the Center and the EPA to carry out the objectives of the Solar for All program.

115. The Grant Agreement is a fully-integrated, written contract that demonstrates (1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) actual authority on the part of the government's representative to bind the government in contract.

116. The EPA's Associate Award Official executed the Grant Agreement on behalf of the EPA. The EPA's Associate Award Official was authorized to execute contractual agreements on behalf of, and to bind, the United States.

117. By entering into the Grant Agreement, the EPA obligated federally appropriated funds to the Center to perform certain obligations under the Solar for All program.

118. The EPA breached the terms and conditions of the Grant Agreement by improperly and wrongfully terminating the Grant Agreement.

119. Section 5 of the Grant Agreement (Termination) provided the sole basis for the EPA to terminate the Grant Agreement. That provision states:

> EPA maintains the right to terminate this Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination.

120. On August 7, 2025, the EPA terminated the Grant Agreement by transmitting the Termination Memorandum.

121. According to the Termination Memorandum, the EPA terminated the Grant Agreement, in relevant part, because "Section 60002 of OBBBA repeal[ed] the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescind[ed] unobligated amounts to carry out Section 134."

122. The Termination Memorandum did not assert that the EPA terminated the Grant Agreement based on the Center's substantial noncompliance that materially impaired performance, assert that the EPA possessed evidence of the Center's waste, fraud, or abuse, or assert that the Center materially misrepresented its eligibility status.

123. The EPA's unilateral termination through the Termination Memorandum breached the express terms of the Grant Agreement because the termination provision of the Grant Agreement did not permit the EPA to issue a termination based on the OBBBA. *See United States v. Winstar*, 518 U.S. 839, 910, 116 S. Ct. 2432, 135 L.Ed.2d 964 (1996).

124. The EPA's breach of the Grant Agreement caused the Center to suffer damages in an amount to be proven at trial.

## COUNT II
## BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

125. The Center incorporates the preceding paragraphs by reference as though fully set forth herein.

126. The Tucker Act permits the Center to bring suit in the United States Court of Federal claims seeking "judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

127. "Every contract imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting Restatement (Second) of Contracts § 205 (1981)) (other citations omitted). "A party breaches the contract when it fails to abide by this implied duty, which includes the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

128. The Grant Agreement is a binding contract between the Center and the EPA to carry out the objectives of the Solar for All program.

129. The Grant Agreement is a fully-integrated, written contract that demonstrates (1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) actual authority on the part of the government's representative to bind the government in contract.

130. The EPA's Associate Award Official executed the Grant Agreement on behalf of the EPA. The EPA's Associate Award Official was authorized to execute contractual agreements on behalf of, and to bind, the United States.

131. The Grant Agreement incorporated specific terms requiring the EPA to obligate federally appropriated funds to the Center to perform certain obligations under the Solar for All program.

132. Those specific terms upon which the Center relied, and to which the implied duty of good faith and fair dealing in the Grant Agreement attached, include:

a) Section III.Q.5, under which the "EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status;"

b) Section III.Q.5's further promise that, upon any termination, the "EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation;"

c) Section III.E, under which the "EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d)," together with 2 C.F.R. § 1500.8(d), which provides that "[r]ecipients may also keep program income at the end of the assistance agreement as long as they use these funds to continue to operate the revolving loan fund or some other authorized purpose as outlined in their closeout agreement;"

d) Section III.S, the Closeout Agreement, under which, "after the end of the Period of Performance," "the Recipient may keep and use Program Income remaining" and "use Post-Closeout Program Income in accordance with this term and condition;"

e) The Grant Agreement's obligation of $62,050,000 to the Center, which the EPA effectuated by making those funds available for draw-down through the ASAP portal for allowable costs incurred in performing the approved workplan; and

f) The Revised Workplan, which the EPA approved by email on January 17, 2025, confirming that "[t]he updated workplan is in effect," and which committed "$46.8 million (75%) of the $62.4 million NSFA grant award for financial products in the form of the NSFA Revolving Loan and Grant Fund" that "will continue to fund additional solar projects and to benefit eligible participants beyond the five-year NSFA grant period."

g) Section II.H, which requires EPA approval of the Center's QMP and QAPP "[p]rior to beginning Environmental Information operations specified in the Performance Reporting Programmatic Term and Condition," such that the Center's deployment of grant funds through the NSFA Revolving Loan and Grant Fund depended on the EPA's timely review and approval of those documents.

133. Based on these express terms, the Center reasonably expected that: (a) the EPA would not invoke a ground outside Section III.Q.5, or a pretextual justification, to end the Center's performance; (b) any funds de-obligated from the Center would remain dedicated to the Solar for All program through re-obligation to another Eligible Recipient; (c) the Center would be permitted to capitalize the NSFA Revolving Loan and Grant Fund and to retain and use the resulting Program Income after the Period of Performance; (d) the Center would retain access through the ASAP

portal to obligated funds for allowable costs properly incurred before any termination; (e) the EPA would adequately staff the statutorily-authorized Solar for All program; and (f) the EPA would timely review and act upon the QMP, QAPP, and other materials the Grant Agreement required the Center to submit for EPA approval, including technical guidance necessary to prepare those materials, so that the Center could proceed with its approved Revised Workplan; and (g) any administrative dispute EPA invited the Center to file would be decided on its merits.

134. In reliance on these expectations, the Center hired staff, of whom four of five full-time-equivalent employees would not have been hired but for EPA's award; conducted competitive procurements; signed term sheets for program loans; signed a letter of intent to proceed with the first community solar projects; and drew down $696,879 in allowable costs through August 7, 2025.

135. The Center entered into the Grant Agreement with the EPA with the reasonable expectation that the EPA would act in good faith and not unreasonably interfere with the Center's ability to realize the benefits to be derived therefrom.

136. The EPA breached the implied duty of good faith and fair dealing through the following separate acts and omissions:

a) In January and February 2025, the EPA without notice, justification, or explanation repeatedly and improperly suspended the Center's access to obligated funds through the ASAP portal;

b) On August 7, 2025, the EPA suspended and then sharply limited the Center's access to obligated funds through the ASAP portal, notwithstanding its representation in the Termination Memorandum that the Center "may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs

incurred up to the date of this memo," thereby interfering with the Center's ability to recover properly incurred obligations;

c) The EPA failed to de-obligate and re-obligate the Center's uncommitted funds to another Eligible Recipient as Section III.Q.5 contemplates, and instead declared "the decision to terminate the SFA program and existing grants," thereby eliminating the program-wide dedication of obligated funds for which the parties bargained;

d) The EPA invoked Section 60002 of the OBBBA as the reason for terminating the Grant Agreement, although that provision rescinds only "the unobligated balances of amounts made available to carry out that section," Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (2025), and although the Center's award had been obligated in July 2024, the EPA thereby relied on a pretextual statutory justification to evade the limits on its termination authority in Section III.Q.5;

e) The EPA failed to maintain adequate staff to oversee the statutorily authorized Solar for All program;

f) Having required the Center under Section II.H to obtain EPA approval of its QMP and QAPP before deploying grant funds, the EPA delayed its review and approval of the Center's QMP for more than four months, and repeatedly delayed issuance of the household savings technical guidance on which the Center's QAPP depended until July 2025, just weeks before the termination, thereby delaying the Center's placement of grant funding through the NSFA Revolving Loan and Grant Fund and frustrating its implementation of the approved Revised Workplan;

g) The EPA invited the Center to dispute the termination under 2 C.F.R. § 1500.15 and then dismissed the Center's timely dispute as moot without reaching its merits, and

has not responded to the Center's November 20, 2025 petition for reconsideration under 2 C.F.R. § 1500.17; and

h) Through the acts set forth in subparagraphs (a) through (f), the EPA eliminated the Center's ability to capitalize the NSFA Revolving Loan and Grant Fund and to retain and use Program Income after the Period of Performance under Sections III.E and III.S and 2 C.F.R. § 1500.8(d).

137. The EPA's actions interfered with the Center's performance of the Grant Agreement and destroyed the Center's reasonable expectations regarding the benefits to be derived from its performance of the Grant Agreement, including its liquidation of properly incurred obligations and its implementation of the approved Revised Workplan, and destroyed the Center's reasonable expectations regarding the fruits of the Grant Agreement.

138. The EPA's breach of the implied covenant of good faith and fair dealing caused the Center to suffer damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, the Center respectfully requests that this Court enter judgment in its favor and grant the following relief:

1. Award money damages to the Center in an amount to be determined at trial;
2. Award any allowable pre- and post-judgment interest;
3. Award the Center its reasonable fees, costs, and expenses, including attorney fees, pursuant to 28 U.S.C. § 2412; and
4. Grant other such relief as this Court may deem proper.

Dated: October 29, 2026

Respectfully submitted,

*/s/ Shaun C. Kennedy*
Shaun C. Kennedy
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
Telephone: (303) 685-7417
Email: shaun.kennedy@gtlaw.com

*/s/ Richard W. Arnholt*
Richard W. Arnholt
BASS, BERRY & SIMS PLC
1201 Pennsylvania Avenue, Suite 300
Washington, DC 20004
Telephone: (202) 827-2971
Email: rarnholt@bassberry.com

*Counsel for the Center for Rural Affairs*

OF COUNSEL:

Jennifer Whitfield
Kimberley Hunter
Southern Environmental Law Center
136 E. Rosemary St., Ste. 500
Chapel Hill, NC 27514

Gary DiBianco
Lawyers for Good Government
6218 Georgia Ave. N.W., #5001
Washington, D.C. 20011

730322941v1